# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 16-733V
Filed: June 6, 2018

```
* * * * * * * * * * * * * * *
LORA THOMAS,                          *
                                      *
              Petitioner,             *
v.                                    *        Ruling on Onset; Influenza ("Flu")
                                      *        Vaccine; Shoulder Injury Related to
SECRETARY OF HEALTH                   *        Vaccine Administration ("SIRVA")
AND HUMAN SERVICES,                   *
                                      *
              Respondent.             *
* * * * * * * * * * * * * * *
```

*Edward M. Kraus, Esq.*, Law Offices of Chicago Kent, Chicago, IL, for petitioner.
*Ann D. Martin, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON ONSET[1]

**Roth**, Special Master:

On June 22, 2016, Lora Thomas ("Ms. Thomas" or "petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] ("Vaccine Act" or "the Program").  Petitioner alleges that the seasonal influenza vaccine she received on September 13, 2013, caused her to suffer from pain, limited range of motion, and weakness in her right shoulder and upper arm.  Petition, ECF No. 1.

Respondent stated that the medical records in this matter are insufficient to demonstrate the requisite facts to establish compensation under a causation theory and the most

---

[1]  This ruling will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012).  As provided in 42 U.S.C § 300aa-12(d)(4)(B), however, the parties may object to the ruling's inclusion of certain kinds of confidential information.  To do so, each party may, within 14 days, request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy."  Vaccine Rule 18(b).  Otherwise, this decision will be available to the public in its present form.  *Id.*

[2]  National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986).  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

contemporaneous medical records are inconsistent with a claim of Shoulder Injury Related to Vaccine Administration ("SIRVA").  Respondent's Rule 4(c) Report ("Resp. Report") at 7, ECF No. 11.  Respondent further stated that the record indicates that petitioner received both a flu vaccine and a shingles vaccine[3] on September 13, 2013, but does not indicate in which arm each vaccine was administered; therefore, there is no proof that petitioner received the flu vaccine in her right arm.  *Id.* at 7-8.  Finally, respondent stated that the medical records show that petitioner did not mention any pain or other symptoms in her right arm or shoulder during medical appointments on October 24, 2013 and November 6, 2013.  *Id.* at 8.  The first complaint of a shoulder issue was relayed to a physician on January 10, 2014 in the context of multiple joint pains, including neck, shoulder, and heel pain.  *Id.*  The record of that visit does not contain any report that the onset of shoulder pain occurred in relation to petitioner's September 2013 vaccinations.  *Id.*

Petitioner filed an affidavit on June 27, 2016, affirming that she received a flu shot in her right arm at Walgreens on September 13, 2013.  Pet. Ex. 11 at 1, ECF No.7.  Petitioner stated that the pharmacist stood over her when she injected the vaccine; petitioner then felt some unusual pain and discomfort immediately after the vaccination.  *Id.*  Petitioner affirmed that, over the next few months, she had pain and weakness in her right shoulder but was also having significant ongoing problems with her back in the fall of 2013, which were more of a concern to her at that time because they affected her mobility and balance.  *Id.*  Petitioner was also preoccupied with taking care of her ill brother.  *Id.* at 2.  According to petitioner, her first complaint of shoulder pain was at a medical visit in January 2014 and then to her primary care physician in March 2014.  *Id.*

In order to resolve the discrepancies between the medical records and the foregoing facts as submitted by petitioner, a fact hearing was held on June 8, 2017.  The petitioner, Ms. Lora Thomas, her sister, Ms. Rita Thomas, and petitioner's primary care physician, Dr. Raymond Kazmar, testified.

## I. Procedural History

Petitioner filed her petition on June 22, 2016, and filed medical records and medical literature the following week.  ECF Nos. 1, 6-7.  Respondent filed a Rule 4(c) Report on October 5, 2016, stating that, based on the existing record, "petitioner has not demonstrated an entitlement to compensation under the terms of the Vaccine Act."  Resp. Rpt. at 9, ECF No. 11. From November 2016 through May 2017, petitioner filed additional medical records, articles of medical literature, and affidavits in support of her claim.  ECF Nos. 14, 16, 23.

A fact hearing was held on June 8, 2017.  Pre-Hearing Scheduling Order, ECF No. 25. After the hearing, petitioner was ordered to file additional medical records.  Scheduling Order, ECF No. 27.  Petitioner's medical records were filed on September 8, 2017, and October 12, 2017.  ECF Nos. 30, 32.  This matter is now ripe for ruling.

---

[3]       The varicella zoster, or "shingles" vaccine is not covered by the Vaccine Program.  *See* 42 C.F.R. § 100.3(a); *see also Scanlon v. Sec'y of Health & Human Servs.*, No. 13-219V, 2013 WL 5755061 (Fed. Cl. Spec. Mstr. Sept. 27, 2013), *mot. for rev. denied*, 114 Fed. Cl. 135 (2013).

## II. The Factual Record

### A.      Petitioner's Pre-Vaccination Medical History

Petitioner was born on July 16, 1948.  On September 13, 2013, she was 66 years old.
Petitioner's past medical history includes bilateral knee replacements in 2000, lower back
laminectomy and fusion in 2002, umbilical hernia repair in 2009, left knee revision in 2011, and
left hip replacement in 2012, as well as gastric band surgery and hammertoe surgery.  She has
degenerative joint disease and arthritis.  Petitioner has used a cane in her right hand for balance
and gait disturbance since her lower back surgery in 2002.  She has taken hydrocodone[4] for pain
for several years.  Pet. Ex. 1 at 2, 6; Pet. Ex. 9 at 4-12; Pet. Ex. 10 at 14; Pet. Ex. 26 at 11-20, 26;
Pet. Ex. 28 at 6, 24.

Dr. Kazmar was petitioner's primary care physician from 1998 until his retirement in or
around August 2014.  Tr. 86.  Petitioner's use of a cane in her right hand due to instability and
balance issues since 2002 was documented throughout the record, as was her use of hydrocodone
for pain.  *See* Pet. Ex. 9 at 4, 7; Pet. Ex. 23 at 3-6; Pet. Ex. 26 at 7, 10-13, 22, 25, 26, 33, 36; Pet.
Ex. 28 at 8, 12; Pet. Ex. 32 at 11, 13, 19.  In addition to office visits, Dr. Kazmar's records reflect
notes for phone calls to and from petitioner for test results and/or medication renewals.[5]

On June 11, 2012, petitioner presented to Dr. Kazmar post hip surgery.  She used a cane
for balance and was noted as having "orthostasis symptoms."[6]  Pet. Ex. 23 at 4.

Petitioner next visited Dr. Kazmar on October 10, 2012, for various health issues,
including osteoarthritis with left groin pain, osteoarthritis with limited range of motion of her
cervical spine, and pain in her left total knee arthroplasty.  She was using a cane for balance.  Dr.
Kazmar ordered a CT of petitioner's cervical spine; he also noted "doctor who did surgery 2003
on C-spine said no more."[7]  Pet. Ex. 23 at 4-5.

On April 2, 2013, petitioner presented to Dr. Henry Finn, her orthopedist since 2010.
Petitioner was noted to be one year post total hip replacement and two years post left knee
revision.  She complained that her left leg appeared to be shorter than her right leg.  She was
receiving physical therapy for her lower back pain which she "has had chronically for several
years and still continues to have problems with sciatica."  She walked with a cane and needed

---

[4]      Hydrocodone is also referred to by the brand name "Norco."  It is an opioid prescribed for the
treatment of moderate to moderately severe pain.  *See acetaminophen/hydrocodone bitartrate– Drug
Summary*, PDR: PRESCRIBERS DIGITAL REFERENCE, http://www.pdr.net/drug-summary/Norco-
acetaminophen-hydrocodone-bitartrate-24010 (LAST VISITED MAY 11, 2018).

[5]      These kinds of entries will become important in the analysis of this case.

[6]      Orthostasis is a decrease in blood pressure that occurs when standing erect and can cause
lightheadedness, dizziness, and fainting.  *See Dorland's Illustrated Medical Dictionary* 1339 (32nd ed.
2012) ("*Dorland's*").

[7]      There are no records for this doctor or any records filed for cervical surgery.

hydrocodone or Ultram for back pain. Pet. Ex. 26 at 7. Following his examination, Dr. Finn assured her that her legs were of equal lengths and suggested a pain specialist. Voltaren gel was prescribed for her knee. Shoe inserts were suggested for hip comfort and mobility. *Id.* at 8.

On May 3, 2013, petitioner returned to Dr. Howard Robinson for pain management. She had not seen Dr. Robinson since 2001. Petitioner noted ongoing back pain with occasional radiating pain which had been constant for years but became worse in the last six months. Pet. Ex. 32 at 17. Dr. Robinson ordered an MRI and flexion x-rays; he also noted that petitioner had multiple procedures planned for the upcoming few weeks, and directed her to continue with hydrocodone. *Id.* at 19.

Petitioner underwent a colonoscopy on May 8, 2013, a mammography on June 11, 2013, and an MRI of the lumbar spine and flexion x-rays on June 26, 2013. Pet. Ex. 3 at 120, 122; Pet. Ex. 33 at 13, 37-38, 68.

On July 12, 2013, petitioner returned to Dr. Robinson. The MRI showed increased degenerative disease above her fusion site with some stenosis of $L_{1-2}$ and $L_{2-3}$. She was noted to be doing aquatic therapy and said it was helpful. Pet. Ex. 32 at 12. She reported more pain on the right side. She had balance issues and used a cane. *Id.* at 13. She was to continue with aquatic therapy and return in six weeks. Sacroiliac joint injections were to be considered. *Id.* at 14.

Petitioner presented to Dr. Kazmar on August 14, 2013, for a routine visit with complaints of left foot neuropathy. Petitioner requested a referral to a specialist. Pet. Ex. 23 at 5. Petitioner reported that she saw Dr. Fuller because she felt like she was walking on marbles and her left heel was painful.[8] Pet. Ex. 23 at 6; *see also* Pet. Exs. 18, 30.

## B.   Petitioner's Post-Vaccination Medical Records

On September 13, 2013, petitioner presented to Walgreens for an influenza vaccine. The Walgreens record documents petitioner's receipt of influenza and Zostavax vaccines on that date. The record does not indicate in which arm each vaccine was administered. Pet. Ex. 8 at 3.

Later that day, petitioner presented to Dr. Robinson for significant back pain. She had stopped aquatic therapy because the facility was too far away and she was taking care of her ill brother. Pet. Ex. 3 at 79; Pet. Ex. 32 at 10. Upon physical examination, Dr. Robinson reported full range of motion in all joints, normal muscle strength and reflexes with no weakness. Pet. Ex. 3 at 80; Pet. Ex. 32 at 9. His assessment was lower back pain with increased symptoms below the level of petitioner's spinal fusion. Bilateral $L_5$-$S_1$ facet joint injections combined with bilateral sacroiliac joint injections were recommended. Pet. Ex. 3 at 81; Pet. Ex. 32 at 11.

On October 7, 2013, petitioner presented to Ingalls Memorial Hospital where Dr. Robinson performed bilateral facet joint injections combined with bilateral sacroiliac joint injections under fluoroscopic guidance. Pet. Ex. 3 at 82-85, 92; Pet. Ex. 32 at 4-6.

---

[8]      Only Dr. Fuller's records for 2014 were filed.

4

Petitioner returned to Dr. Robinson on October 21, 2013 for follow-up.  She reported no relief of her lower back pain after the injections.  She reported no new symptoms.  She was noted to have full range of motion in all joints.  Pet. Ex. 32 at 1-3.

On October 24, 2013, petitioner presented to Dr. Kazmar for a routine visit.  She complained of frequent urination, hoarseness, pharyngitis ongoing for a week, cough, and heartburn at night.  She requested a referral to a gastrointestinal specialist and a note to be excused from jury duty.  She was noted to use a cane for pain and balance.  A physical examination was conducted and lab work was ordered to test for diabetes and carpal tunnel syndrome.  Pet. Ex. 23 at 6-7.

A notation entered in Dr. Kazmar's record dated November 4, 2013 stated petitioner's "Lab OK PT TPU in AM" followed by "part time job Concentra Medical Center."[9]  Pet. Ex. 23 at 7.

On November 6, 2013, petitioner presented to Dr. Finn with complaints of balance difficulties and unsteady gait.  She used a cane.  Petitioner's x-rays looked fine.  Dr. Finn's impression was that she had neurologic problems related to her spine, brain, or inner ear.  A recommendation to see a physiatrist for evaluation of unsteady gait was made.  Dr. Finn specifically noted that petitioner was not complaining of pain in the joints.  Pet. Ex. 9 at 3; Pet. Ex. 26 at 6.

Petitioner's next medical visit was January 10, 2014, when she presented to Dr. Modupe Oladeinde, a new primary care physician, due to Dr. Kazmar's pending retirement.  Medication refills were requested.  Petitioner complained of "multiple [joint] pains and needs referrals to specialists.  She has a [history of] multiple [joint] surgeries on her knees, hip and back."  Pet. Ex. 2 at 31.  She complained of "being out of balance with her gait since back surgery."  *Id.* "Review of Symptoms" noted "Musculoskeletal: neck pain, shoulder and heel pain." "Neurological" noted "[abnormal] gait."  *Id.*  Petitioner advised that she had been referred to a physiatrist but since her insurance changed she did not go.  *Id.*  Following extensive examination, Dr. Oladeinde noted gait abnormality as a result of back surgery but otherwise normal neurological exam, dry eyes, and edema of both lower legs, for which she took a diuretic. Referrals were provided for post-laminectomy balance evaluation and management, ophthalmology examination, and a general surgeon for hemorrhoids.  Medication refills were provided.  *Id.* at 32.

---

[9]       This entry appears to be like others that followed routine examination throughout the record, in which phone calls between Dr. Kazmar and petitioner transpired to discuss her blood work done on October 23, 2013.  When compared to other similar entries it appears to mean, "Labs were OK, patient to pick up (TPU) a copy in the morning."  A month later, on December 6, 2013, Dr. Kazmar sent a fax to Concentra Medical Center which stated, "I have been treating Laura [sic] Thomas since 1998 for osteoarthritis of the knees and spine with anti-inflammatory agents and Hydrocodone APAP 10/325 2 tablet GID.  She has never reported any side effects, no dizziness, and no episodes of falling.  The medications should cause no problems with her work."  Pet. Ex. 28 at 3.

Petitioner presented for routine examination with Dr. Kazmar on March 6, 2014, with complaints of cough, right shoulder pain, and left hip pain. Dr. Kazmar noted: "Rt shoulder – uses a cane to walk and uses right arm assist when rising sit to stand." Following examination, Dr. Kazmar wrote: "PE shoulder S0 L1 0-90 abduction," "no synovitis MCP, wrist…plan Rt. shoulder."[10]  Pet. Ex. 23 at 7.

An x-ray of the right shoulder performed on March 29, 2014, provided:

There is no acute fracture or dislocation. There are moderate degenerative changes with osteophyte formation along the inferior margin of the humeral head. There is widening of the acromioclavicular joint raising question of possible prior postsurgical change.

Multiple rounded and oval calcification densities project adjacent to proximal humerus raising the suspicion of synovial osteochondromatosis.

Pet. Ex. 3 at 54.

On April 28, 2014, petitioner presented to Dr. Vivek Kaistha, another primary care physician. She provided her surgical history along with complaints of balance issues. She was taking hydrocodone for pain. She complained of headache and left eye redness for a year. She complained of a cough for six months that was worse at night. She walked for exercise five times per week. She complained of fatigue, malaise, sleep disorder, eye irritation, cough, hemorrhoids, joint pain, back pain, arthritis, numbness, tingling, and depression. Upon examination, Dr. Kaistha noted back pain with radiculopathy and degenerative joint disease, among various other health conditions. Lab tests and chest x-rays were ordered. Pet. Ex. 34 at 11-19.

On May 16, 2014, petitioner underwent testing at Ingalls Memorial Hospital. A transthoracic echocardiogram showed mild bi-atrial enlargement, EMG/NCS studies showed evidence of chronic L5-S1 radiculopathy and mild motor demyelinating neuropathy, and chest x-rays revealed old granulomatous disease. Color duplex Doppler evaluation of both carotid and vertebral arteries due to diabetes and hypertension showed 50 to 69 percent stenosis distally in the left carotid artery. Further assessment was recommended. Pet. Ex. 3 at 17, 23, 47; Pet. Ex. 34 at 73-75.

Petitioner returned to Dr. Kaistha on June 2, 2014 for test results. Dr. Kaistha noted carotid stenosis and left eye hemorrhage but "other labs are good." Pet. Ex. 34 at 6. Dr. Kaistha

---

[10]     In a transcription of his office records, Dr. Kazmar provided a list of what the abbreviations throughout his records meant. Pet. Ex. 23 at 1. Dr. Kazmar defined "PE" as "physical examination," "Sh" as "shoulder," "S0" as "no swelling," "T0" as "no tenderness," and "L1" as "reduced range of motion." *Id.* Contained in his transcription of abbreviations, Dr. Kazmar wrote ROM (range of motion) 0-80 degrees abduction on right and 0-70 degrees abduction on left followed by "Pf = painful." *Id.* The actual office record on that date noted only examination of the right shoulder, with 0-90 degree abduction. *Id.* at 7.

further noted petitioner "[c]omplains of joint pains" and "right shoulder pains since [M]arch 2012."[11]  *Id.* at 7.  Dr. Kaistha's impression was right shoulder pain, eye pain, and gastrointestinal issues.  *Id.* at 9.

On June 4, 2014, petitioner presented to Ingalls Calumet City Primary due to headache and left eye redness.  Examination of her upper extremities, range of motion, motor strength, and sensation was normal and intact.  Petitioner was prescribed pain medication, and instructed to follow-up with her primary care physician.  She was discharged home unaccompanied, ambulating with a cane, and driving herself.  Pet. Ex. 3 at 11-15; Tr. 73.

Petitioner returned to Dr. Kaistha on June 9, 2014 to discuss the results of her angiogram and further testing.  She reported seeing a retina specialist.[12]  She complained of joint pain, back pain, and arthritis.  Dr. Kaistha's impression was carotid stenosis, back pain with radiculopathy, and severe gastrointestinal issues.  Pet. Ex. 34 at 1-4.

Petitioner presented to Dr. Kazmar on June 16, 2014, for left eye redness.  Dr. Kazmar noted "[right] shoulder pain declines injection reviewed x-ray."  She was to follow-up with a vascular surgeon about the carotid artery and "Avoid [right] shoulder [range of motion]."  Pet. Ex. 23 at 8.

On June 18, 2014, petitioner returned to Dr. Finn.  She had no complaints of joint pain, only difficulty with balance and unsteady gait, for which she used a cane.  Examination showed excellent range of motion and strong quads.  Her hip looked fine on x-rays.  Dr. Finn addressed her concern of leg length discrepancy and noted that it could be due to the pelvic obliquity from prior spine surgery.  A shoe insert was suggested.  Pet. Ex. 9 at 2; Pet. Ex. 26 at 5.

Dr. Kazmar conducted his final examination of petitioner on August 18, 2014.  He noted a visit with a neurosurgeon for her carotid artery stenosis with no surgery planned, she was going to see Dr. Fuller for feeling like she had bands on her ankles, and her right shoulder was still painful, "likely impingement."  Physical examination of her shoulder was documented as "S0 L1 0-60 degrees, painful now on forearm."  Pet. Ex. 23 at 9.

On August 19, 2014, petitioner presented to Dr. Fuller for pain and tightness in her feet, difficulty walking for the past five years, and pain and tightness in both legs and ankles for the last two to three years.  She described feeling like she was walking on rocks.  She had ongoing back pain despite a lumbar laminectomy with spinal fusion in 2002.  EMG and NCS studies performed on May 16, 2014 showed chronic L5-S1 radiculopathy and mild motor demyelinating neuropathy.  Pet. Ex. 18 at 2-3; Pet. Ex. 30 at 2-3.

---

[11]     This would have put the onset of petitioner's right shoulder pain a year and a half *prior* to the flu vaccination.

[12]     There were no records filed from a retina specialist.

On August 29, 2014, petitioner underwent a repeat carotid artery study which showed no hemodynamically significant stenosis in the right or left carotid system.  Pet. Ex. 18 at 6; Pet. Ex. 30 at 4.

On October 6, 2014, petitioner returned to Dr. Oladeinde for follow-up.  She complained of gastrointestinal symptoms, chronic lower back pain, musculoskeletal symptoms, lower extremity edema, hemorrhoids, dry eyes, and gait abnormality.  Medications were reviewed, and a full examination was performed.  Petitioner received a flu vaccine in her right arm.  Pet. Ex. 2 at 25-27.

Petitioner returned to Dr. Fuller on October 20, 2014, and reported "no new neurological symptoms since her last visit."  Petitioner was taking Cymbalta for polyneuropathy.  Pet. Ex. 2 at 23; Pet. Ex. 18 at 4-5; Pet. Ex. 30 at 5-6.

On October 29, 2014, petitioner presented to Dr. Yonter for right shoulder pain. Dr. Yonter's assessment of petitioner was right rotator cuff tendonitis, possible degenerative joint disease in the right shoulder, gait disturbance, leg length discrepancy, lumbar stenosis status post fusion, degenerative joint disease in both knees, left hip status post replacements, degenerative joint disease of the right hip, and status post gastric bypass with weight loss.  A steroid injection to the right shoulder was performed.  Dr. Yonter prescribed physical and occupational therapy for gait training and right shoulder rotator cuff tendonitis.  Pet. Ex. 1 at 6-7.

On November 19, 2014, petitioner returned to Dr. Finn with continuing complaints of gait problems.  He noted that her x-rays looked fine.  Shoe inserts were again suggested.  Pet. Ex. 9 at 1; Pet. Ex. 26 at 4.

On December 5, 2014, petitioner returned to Dr. Oladeinde for follow-up. Petitioner had complaints of chronic left heel pain.  An x-ray of the left heel was ordered.[13]  Petitioner received a Zostavax vaccine in her right deltoid.  Pet. Ex. 2 at 20-21.

On December 10, 2014, petitioner returned to Dr. Yonter.  She reported partial benefit from the steroid injection in her right shoulder.  Dr. Yonter noted that she had not started the physical therapy that had been ordered.  Pet. Ex. 1 at 5-6.

On January 16, 2015, petitioner presented to Dr. Michael McDermott, a podiatrist.  A heel x-ray was negative.  She returned in April 2015 with no significant changes.  Pet. Ex. 2 at 10, 18.

Petitioner returned to Dr. Oladeinde on January 28, 2015.  She was noted to be "doing well except for some [lower back pain], chronic."  Blood tests were ordered and petitioner received a refill for hydrocodone.  Pet. Ex. 2 at 14-16.

---

[13]    X-rays of the heel performed on December 29, 2014, revealed normal left calcaneus and talonavicular joint osteoarthritis.  Pet. Ex. 2 at 19.

Petitioner attended physical and occupational therapy from February 10, 2015 to March 25, 2015; upon discharge, she was feeling better, with both gait stability and decreased shoulder pain. Pet. Ex. 4 at 9-13, 45-49; Pet. Ex. 5 at 53-54.

On April 17, 2015, petitioner returned to Dr. Yonter with complaints of right shoulder pain and gait dysfunction. She reported that physical and occupational therapy treatments had helped her gait and right shoulder, but she had right shoulder pain at night which was laterally localized. She received a steroid injection in her right shoulder and was instructed to return to therapy. An EMG/NCS for her bilateral extremities was ordered. She was to continue taking hydrocodone for pain. Pet. Ex. 1 at 3-4.

An MRI of petitioner's right shoulder was ordered by Dr. Yonter on May 11, 2015. The MRI revealed a high grade partial tear of the distal supraspinatus tendon along the articular surface, a labrum tear, and multiple loose bodies. Pet. Ex. 1 at 9-10.

On May 21, 2015, petitioner underwent EMG/NCS testing of her upper and lower extremities. She reported on that date that she "had a flu shot last year, started having shoulder pain afterwards along with some weakness at the right shoulder girdle muscles."[14] Pet. Ex. 1 at 8. The EMG/NCS testing revealed "chronic left L5-S1 lumbar radiculopathy" and "right moderately severe median mononeuropathy at the wrist consistent with carpal tunnel syndrome." *Id.*

On June 5, 2015, petitioner returned to Dr. Oladeinde with complaints of "joint pain, joint stiffness and back pain." Pet. Ex. 2 at 7. Upon physical examination, Dr. Oladeinde noted that petitioner ambulated with a cane and had limited range of motion of the right shoulder. *Id.* at 9.

Petitioner returned to Dr. Yonter on June 12, 2015, who referred her to Dr. Steven Chandler, an orthopedic surgeon, for rotator cuff tear. Pet. Ex. 1 at 2-3; Tr. 37.

On August 14, 2015, petitioner presented to Dr. Chandler for an initial consultation of her right shoulder. She reported a date of onset in September 2013 following an injection in her shoulder with pain ever since. She reported no relief from physical therapy or cortisone injections. She presented without any assistive devices. She denied any other injury at the time of the occurrence. Petitioner filled out a general history form noting the date of injury as September 20, 2013. Dr. Chandler's assessment was osteoarthritis of right shoulder acromioclavicular joint, rotator cuff tendonitis, right impingement syndrome with partial tear, and right bicipital tendonitis. Dr. Chandler discussed orthopedic goals and surgery. A TENS unit and cold packs were ordered. Pet. Ex. 2 at 1-4; Pet. Ex. 27 at 31-35, 101.

On October 13, 2015, petitioner underwent right shoulder rotator cuff repair, subacromial decompression, biceps tenotomy, excision of the distal clavicle and limited debridement. The post-operative diagnosis was full thickness rotator cuff tear, impingement syndrome, biceps tendinitis, acromioclavicular joint arthritis of the right shoulder, glenohumeral joint arthritis, and degenerative labral tear. Pet. Ex. 27 at 89-90.

---

[14]     This would have put the causal flu vaccination in 2014, rather than 2013 as petitioner alleges in her petition.

Between November 2015 and February 2016, petitioner participated in more than twenty therapy sessions for post-surgery treatment for her right shoulder.  Pet. Ex. 6 at 6-9; Pet. Ex. 27 at 25-28; *see generally* Pet. Ex. 13, 31.

On January 15, 2016, petitioner returned to Dr. Chandler and was noted to be attending physical therapy and doing well.  She had no new complaints.  Dr. Chandler noted that petitioner still had problems reaching to the side and back.  Following examination, Dr. Chandler noted that petitioner's range of motion after rotator cuff repair was very good but she still had some residual weakness which was to be expected.  Continued physical therapy was ordered.  Pet. Ex. 12 at 1-3; Pet. Ex. 27 at 14-17.

Petitioner returned to Dr. Chandler on April 13, 2016.  She had completed physical therapy but reported pain and limited range of motion.  She had developed a frozen shoulder.  Dr. Chandler discussed treatment options with possible manipulation.  Petitioner asked to return to physical therapy first; then if there were no improvement, possible manipulation under anesthesia would be considered.  Pet. Ex. 22 at 6-8; Pet. Ex. 27 at 9-13.

Petitioner presented to Dr. Chaudri at Dr. Chandler's office on May 2, 2016, with continued shoulder pain.  She was using a cane and reported pain going down her arm.  Dr. Chaudri noted possible re-tear of the rotator cuff.  Corticosteroid injection into the subacromial bursa of the right shoulder was administered.  Pet. Ex. 22 at 1-4; Pet. Ex. 27 at 4-6.

On May 23, 2016, petitioner presented to Dr. Nikhil Verma, for evaluation of right shoulder pain.  Dr. Verma recorded the following history:

> Patient is a very pleasant 67-year-old female who presents today for initial evaluation in regards to her right shoulder.  She reports she underwent a rotator cuff repair by Dr. Chandler at Southwest Orthopedics.  In October of 2015, she reports that she had a bad flu injection that resulted in a rotator cuff tear that was repaired.  Following surgery, she had no improvement with her symptoms.  She did have limited range of motion especially getting above her head, brushing her teeth, and combing her hair.  She has daily pain and would like to know her options on moving forward.  She did complete a course of physical therapy without full alleviation of her symptoms.

Pet. Ex. 29 at 5.  MRI and x-rays of the right shoulder showed end stage osteoarthritis with associated rotator cuff tear.  Dr. Verma recommended reverse arthroplasty.  *Id.* at 7, 9.

## C.    The Affidavits and Testimony of the Witnesses

### 1.    Affidavit and Testimony of Lora Thomas

 Petitioner submitted an affidavit and testified at hearing.  In her affidavit, petitioner affirmed that because of significant ongoing problems with her back and hip in the fall of 2013, which were more of a concern for her because those issues affected her mobility and balance, she

did not complain to any doctor about her shoulder until a medical visit in January of 2014 and then to her primary care physician in March of 2014.  Pet. Ex. at 2-3.

At hearing, petitioner testified to her various prior medical issues, including a spinal fusion in 2002, knee replacement surgery, left hip replacement surgery, and bariatric surgery. Tr. 8-10.  According to petitioner, before she received the flu vaccine, she had had stiffness in her right shoulder due to arthritis; a year or two before her flu shot, her rheumatologist gave her an injection in her shoulder for the arthritis pain and stiffness.[15]  Petitioner had not had any other difficulties with her right shoulder prior to receiving the flu vaccine.  Tr. 10-11.

Petitioner testified that she received the flu vaccine in her right arm at Walgreens on September 13, 2013.  It was the second or third flu vaccine that she had received.  Tr. 11-12. She denied receiving a Zostavax vaccine on that date, and stated that the record is wrong.  Tr. 65. According to petitioner, the pharmacist stood over her to administer the vaccine, following which she felt immediate, "deep stinging type pain," that was "extreme."  Pet Ex. 11 at 1; Tr. 12-13.

Petitioner stated that she received the vaccine in the morning and presented to Dr. Robinson that afternoon for a pain injection in her back, but probably did not mention her shoulder pain to him.  Tr. 67-68.  According to petitioner, when she returned to Dr. Robinson on October 7, 2013, for another pain injection in her back, she told the nurse that when she would lie in a certain way her shoulder hurt.  Tr. 69-70.

According to petitioner, after her receipt of the flu vaccine she continued to have pain that worsened a little bit.  Over the next few months, she continued to feel pain and weakness in her right shoulder.  Petitioner stated that she was taking hydrocodone for her back, which masked her pain.  Pet. Ex. 11 at 1; Tr. 14.

Petitioner stated that at the time of her flu vaccination, she was having significant, ongoing "new and unusual" problems with her back, which were affecting her mobility and balance, and were more of a concern to her.  Pet. Ex. 11 at 1.  She was also taking care of her ill brother.  Id. at 2.  Petitioner testified that she had previously been diagnosed with severe right-sided neuroforaminal narrowing of her cervical spine, which caused stiffness, but denied that she ever suffered right-sided shoulder pain as a result.  Tr. 66-67.

Petitioner testified that Dr. Kazmar was her doctor for over 20 years.  Petitioner initially testified that she could not recall why she went to see him in October 2013, but testified that she casually mentioned having some pain in her right shoulder after an injection at that examination. She also wanted a note for jury duty, due to her back pain limiting her ability to walk any distance and her balance problems.  Tr. 15-16.  Petitioner later stated that she saw Dr. Kazmar on a routine basis for follow-ups of her health issues, which is why she was there in October 2013. After each appointment, she would be given the next appointment date and a prescription for blood work.  Tr. 50-54.

---

[15]     There are no records regarding this injection.

According to petitioner, she called Dr. Kazmar on November 4, 2013 to advise him of her shoulder trouble. Tr. 17-18. She stated that she and Dr. Kazmar had a discussion about physical therapy and following up with him after completing therapy. Tr. 55-57. Petitioner stated that Dr. Kazmar was going to leave a prescription for physical therapy for her to pick up the next day, but she never picked it up because she had other things going on in her life and could not afford the physical therapy. Tr. 17-19, 54-55, 58. Petitioner admitted to having Medicare, but knew there would be out of pocket expenses as well. Petitioner stated that she has had "quite a bit" of physical therapy for her back, hips, and knees, but had not had physical therapy since her hip surgery in March 2012 until she went for her shoulder. Tr. 58-60.

Petitioner made no mention in her affidavit of seeing Dr. Finn in November 2013, but when asked at hearing, she stated that she saw Dr. Finn "on a pretty regular basis." Petitioner added that she mentioned her shoulder pain to him and his assistant at that visit, but they did not pay attention because he is a "revisionist" and she was there to discuss her knee and the possibility of additional surgery. Tr. 70-71.

According to petitioner, by January 2014, her shoulder pain and weakness had worsened, and her range of motion was limited. Because Dr. Kazmar was going to retire, petitioner made an appointment with Dr. Modupe Oladeinde. She gave Dr. Oladeinde a complete medical history of all of her medical problems, including her back and shoulder pain. According to petitioner, she spoke with Dr. Oladeinde at length about her shoulder pain, and how much trouble it was causing her, but Dr. Oladeinde said she had never heard of a flu vaccine causing shoulder pain. Petitioner stated that Dr. Oladeinde suggested she see a specialist, but since petitioner was uncertain if she would be using her as her primary care physician, she did not go. Pet. Ex. 11 at 2; Tr. 20-23.

Petitioner testified that her next medical visit with Dr. Kazmar in March 2014 was for cough, right shoulder pain, and left hip pain that was flaring up at that time. Tr. 61-62. According to petitioner, she told Dr. Kazmar at that visit that she did not go to physical therapy because she could not afford it. Tr. 63. Petitioner testified that he referred her for x-rays and an MRI, but she had only the x-ray done because she could not afford the MRI. Tr. 24, 28. In her affidavit, petitioner affirmed only that Dr. Kazmar referred her "for an x-ray, which she had done later that month." Pet. Ex. 11 at 2. She did not return to Dr. Kazmar again until June 2014. Tr. 28-29.

Petitioner testified that by March 2014, her right shoulder pain had gotten worse, she could not comb her hair or raise her arm overhead. Being right handed, there was a lot she could not do. Tr. 24-25, 72. When asked to provide to whom she would have complained about her shoulder pain between September 2013 and March 2014, she stated that she mentioned it to Dr. Kazmar, but the pain was not significant because the hydrocodone was covering it up, and because she had other issues going on at that time. She then stated that she was trying to ignore the pain because she did not want to accept that she was having another skeletal issue. Tr. 71-72.

Petitioner acknowledged using a cane in her right hand for balance for a long time, but denied that the use of the cane had any effect on her shoulder. She stated that she did not rely on her cane to stand from a seated position. Tr. 26-27.

Petitioner was questioned about a visit she had in June 2014 to Ingalls Calumet City Primary for a headache and left eye redness which documented that she had normal strength and range of motion in her upper extremities. *See* Pet. Ex. 3 at 11-15. Petitioner stated that she did not recall the doctor doing that type of examination, but added that they are known for providing very bad care and are not thorough. Tr. 73, 80-81.

Petitioner recalled her visit with Dr. Kazmar in June 2014 and his mentioning that there was some osteoarthritis on her shoulder x-ray. He suggested a pain injection for her shoulder, but she chose to forgo it because she had some issues with her carotid artery at the time and she was focused on that, not her shoulder pain. Tr. 29-31.

According to petitioner, at her final visit with Dr. Kazmar on August 18, 2014, her shoulder was painful and Dr. Kazmar told her it was an impingement. She stated that she had decided not to discuss it with him any further but would take it up with a new doctor. Tr. 32. Later, while responding to questions about this visit, petitioner stated that she was really having a difficult time with her shoulder at this point; she had ignored it as long as she could and discussed with Dr. Kazmar what else she could do for it. She stated that all of her other issues had been dealt with and she could focus on herself. Tr. 74-75.

According to petitioner, she next saw Dr. Oladeinde in September 2014. Petitioner told Dr. Oladeinde at that visit about her right arm and shoulder pain, but the doctor did not pay attention to her shoulder complaints. She was more focused on petitioner's spinal problems, which were causing significant pain and impacting her balance, as well as her worsening hip problems, which were further complicating her mobility and balance. Pet. Ex. 11 at 2-3. In her affidavit, petitioner stated that Dr. Oladeinde referred her to Dr. Fuller, a neurologist.

Petitioner testified that she saw Dr. Oladeinde again in October 2014 and impressed upon her that she was having problems and could not use her arm much. Dr. Oladeinde referred her to Dr. Yonter, a physiatrist. Tr. 32-33.

Petitioner was asked about the October 2014 visit with Dr. Oladeinde which documents another flu vaccine in her right arm. *See* Pet. Ex. 2 at 25-27. Petitioner stated that she told the medical assistant that she had trouble with her right arm, and received the vaccine in her left arm. If the record says she received the vaccination in her right arm, the record is "definitely incorrect." Tr. 33-34, 75.

Petitioner stated that she saw Dr. Yonter in October 2014 for her shoulder pain and gait and balance problems. Dr. Yonter gave her an injection in her shoulder which helped for a little while; then in 2015, she gave her a prescription for physical therapy which did not help. According to petitioner, she saw Dr. Yonter again in April 2015 and was given another injection. She was still in pain, and could not raise her arm. Dr. Yonter ordered an MRI and sent her to an orthopedic surgeon, Dr. Chandler. Tr. 34-38; Pet. Ex. 11 at 3.

Petitioner was asked about a Zostavax vaccine administered in her right arm which was recorded in Dr. Oladeinde's notes for December 5, 2014. *See* Pet. Ex. 2 at 21. Petitioner stated

she did not receive it in her right arm and other than pain injections for her shoulder injury, has not had any vaccinations in her right arm after the flu vaccine. She then stated that she did not receive a Zostavax vaccination in December 2014. Tr. 75-76.

Petitioner was asked about the history she provided on May 1, 2015, when she presented for EMG testing. The record indicates an onset of shoulder pain one year ago after receiving a flu vaccine. [16] Petitioner stated that the record was incorrect. Pet. Ex. 1 at 8; *cf.* Tr. 79.

Petitioner confirmed that the first MRI she had on her right shoulder was in 2015. Tr. 76. Dr. Chandler performed surgery on her in October 2015 and she attended physical therapy until February or March 2016, but had a difficult recovery. Tr. 38, 76; Pet. Ex. 11 at 3.

Petitioner stated that she continues to have considerable pain and weakness, as well as problems with range of motion. Pet. Ex. 11 at 3. She cannot use her arm. Petitioner testified that prior to her shoulder injury, she was taking golf lessons, and now—due to the vaccination— she cannot swing a golf club, pick up dishes to put them in the cabinet, comb her hair, or do anything that requires her to put her hand to the back of her head. Tr. 39. These are the same problems she experienced prior to the surgery. Tr. 39. She does not drive as much anymore, due to shoulder pain when backing up. Tr. 76. Petitioner later admitted that she has not played golf since 2001 and would have liked to have been able to start playing again, but she cannot. Tr. 64.

According to petitioner, when Dr. Chandler left the practice, she started seeing Dr. Verma, who wants to do more surgery for a re-torn rotator cuff. She has not decided when she wants to do that because the recovery period is six weeks. Tr. 40-41.

Petitioner was asked to describe the difference between the pain she experienced after the September 2013 vaccination and the pain she had at the time of her surgery in 2015. At first, she stated that it was "pretty much the same," then stated that prior to the surgery it was worse than in 2013; she then conceded that in that time frame it had gotten "considerably worse." Tr. 77-79.

On cross examination, petitioner was asked when she learned about the Vaccine Program. Petitioner testified that she learned about it from a news show on TV that was talking about shoulder injuries from vaccines in or about late 2014 or early 2015. Tr. 42-43.

Petitioner then described her communications with Dr. Kazmar in December 2016. According to petitioner, she had not spoken to Dr. Kazmar since her last visit with him in August 2014. In December 2016, she called his old office, left a message, and then spoke to him on the phone. She explained to him that she had an attorney for her vaccine injury and told him about her shoulder pain. She said that she might need him as a witness, and asked if he could help with the information she needed. Tr. 43-45. According to petitioner, she had a few follow-up conversations with him because he was "leery" about getting involved. Petitioner stated that she reminded him of her visit in October 2013 and their casual conversation about her shoulder pain from her vaccination. She stated that Dr. Kazmar said he remembered something about the conversation, but recalled her having something more important or other problems she was

---

[16]     This would have put the onset of petitioner's right shoulder pain eight months *after* receiving the flu vaccination.

dealing with at that time.  She then met him at the library in January 2017.  They did not have much conversation at that time; she had an affidavit for him and he read it to make sure it was accurate, then signed it.  Tr. 45-48.

### 2.    Affidavit and Testimony of Dr. Raymond Kazmar

Dr. Kazmar submitted an affidavit on January 6, 2017 and testified at the hearing.  Pet. Ex. 21.

Petitioner filed four sets of records from Dr. Kazmar.  *See* Pet. Exs. 3, 10, 23, 28.  Pet. Ex. 3 contains 153 pages of records and reports from other providers and facilities for medical care provided to petitioner between 2013 and 2015.  *See* Pet. Ex. 3.  Pet. Ex. 10 contains 17 pages of Dr. Kazmar's handwritten office notes for March 12, 2012, through and including August 18, 2014 test results and radiological reports.  *See* Pet. Ex. 10.  A transcription of Dr. Kazmar's handwritten office records was ordered.  Scheduling Order, ECF No. 17.  The transcribed records were filed as Pet. Ex. 23, which contained nine pages of handwritten notes certified by Dr. Kazmar as being true and accurate.  *See* Pet. Exs. 23, 24.  Dr. Kazmar acknowledged that he had been asked to transcribe his office records in this case and stated that he did so by hand "exactly the way the original records were, only in a more legible manner." Tr. 87-88.  Dr. Kazmar appeared at the hearing with a rather large file he stated had been in storage at his old office.  After the hearing, additional records were requested from Dr. Kazmar from 2008 to the present.  These records were filed as Pet. Ex. 28, which contained 50 pages. Included in the recently filed record were the following: a subpoena to Dr. Kazmar dated February 12, 2013, for petitioner's medical records in a civil action brought by petitioner which purports to be a personal injury action; a letter dated October 8, 2010, from an attorney representing petitioner in an accident which occurred on February 24, 2010;[17] petitioner's disability papers listing spondylolisthesis L4-S1, lumbar spine fusion, and ataxia as the basis for petitioner's disability; various laboratory results; plain films from June 29, 2013 of petitioner's lumbar spine due to lower back pain; CT of the cervical spine dated November 1, 2012, revealing advanced degenerative changes of C5-C6 with severe right sided neuroforaminal narrowing; complaints of right sided neck pain; and Dr. Kazmar's office notes from 2007 which are essentially illegible, but are notable for complaints of back pain, ataxia, cervical spine pain with reduced range of motion radiating to trapezius, complaints of pain at night, no radicular pain to hands or feet, and the need for a cane for balance.  *See* Pet. Ex. 28.

The first two pages of Dr. Kazmar's transcription contain a list of abbreviations and their meanings.  Pet. Ex. 23 at 1-2.  The list of abbreviations and these records are important to the facts in this case and the credibility of the witnesses herein.

Dr. Kazmar was a rheumatologist in the south side of Chicago for 35 years before he retired.  Pet. Ex. 21 at 1; Tr. 83.  He was the primary care physician for about 30 percent of his patients.  Tr. 84.  Dr. Kazmar stated that he saw approximately 25 patients a day in the office, did consultations in the hospital, and had approximately 1,500 files when he retired.  Tr. 85, 106.

---

[17]     There is no information provided regarding what injuries petitioner sustained in this accident.

Petitioner had been Dr. Kazmar's patient since 1998, though he admitted that if he saw her on the street, he did not know that he would recognize her.  Dr. Kazmar stated that he had no independent recollection of any office visits he had with petitioner in 2013 and 2014.  In preparation for his testimony, Dr. Kazmar reviewed his office notes from March 12, 2012 until his last visit with petitioner on August 18, 2014.  He retired soon after her August 2014 visit.  Tr. 85-86, 107.

Dr. Kazmar was questioned about his office notes for August 14, 2013.  *See* Pet. Ex. 23 at 5-6.  He explained that he documented her medical history, noting chief problems that included various types of musculoskeletal pain and her required surgeries.  Other than colds, she had degenerative arthritis type pain.  He stated she had been taking hydrocodone for a long time for back, neck, hip, and knee pain.  According to Dr. Kazmar, he had finally reduced her hydrocodone from eight per day to six or four.  Tr. 89-91.

Dr. Kazmar discussed his office notes from October 24, 2013.  *See* Pet. Ex. 23 at 6-7.  He stated that petitioner complained of frequent urination, being hoarse, and having stomach issues.  Her main problems were pharyngitis and a sore throat.  She also requested a note to be excused from jury duty.  Tr. 92.  When asked, Dr. Kazmar agreed that there was no entry on that date about any shoulder pain.  He stated, however, that it was possible, since she had so many problems, that he chose to document only new ones or the ones that had to be addressed, and ignored the rest.  He added that he did not write down everything at each visit.  Tr. 92-93, 117.  When asked why a new complaint of right shoulder pain would not have been documented, Dr. Kazmar admitted that he really did not know if she mentioned shoulder pain on that date.  Tr. 123.

Dr. Kazmar submitted an affidavit signed in January 2017.  In the affidavit he detailed a telephone call with petitioner which occurred on November 4, 2013, stating:

> In my hand-written notes from a telephone call with her on November 4, 2013, I wrote "PT."  This notation is a reference to Ms. Thomas's arm and shoulder pain and reflects that we discussed the possibility of physical therapy as treatment at that time.  I would not likely have suggested PT on November 4, 2013 unless she had been experiencing the shoulder pain for at least a couple of weeks.  We agreed that we would monitor the situation to see if the pain would improve over time and would discuss it at her next appointment.

Pet. Ex. 21 at 2.

At hearing, Dr. Kazmar was questioned about the November 4, 2013 entry in his transcribed notes.  According to Dr. Kazmar, he ordered labs at petitioner's October 23, 2013 visit.  The labs were normal, so he documented "labs ok."  Tr. 94, 113.  He stated that "PT" meant that he ordered physical therapy and "TPU" meant she was "to pick up" the script tomorrow.  Dr. Kazmar admitted that he had no memory of why he ordered physical therapy; it could have been for her shoulder.  Dr. Kazmar also admitted that he had no memory of petitioner receiving a vaccine.  He stated that it was possible that she called for her lab results on November 4, 2013, and in the course of that conversation mentioned something hurting or not

responding to the Norco she was taking.  It could have been her shoulder.  Tr. 94-96.  He was asked where the copy of the script for physical therapy was in the record.  He responded that he did not have it and could not find it.  Tr. 118.

It was pointed out to Dr. Kazmar that throughout his records he used "PT" to refer to "patient" not "physical therapy."  He agreed.  Tr. 115-16.

Dr. Kazmar was asked where he documented petitioner's complaint of shoulder pain on November 4, 2013. According to Dr. Kazmar, at that time he did not document phone calls.  He would get a pink slip connected to the patient's file advising that the patient had called.  After he returned the call, he did not keep the pink slip.[18]  Tr. 125-26.

Dr. Kazmar was asked why his original office note on November 4, 2013, did not contain the words "physical therapy" under "PT," but his transcription did. Pet. Ex. 10; *cf.* Pet. Ex. 23. Dr. Kazmar again stated that he had no independent recollection of any of the visits or facts in this case, but he added "physical therapy" to the transcription to make it clear what his thoughts were.  Tr. 126-28.

Dr. Kazmar was asked to address the visit of March 6, 2014, and why he noted "[U]ses a cane to walk and uses right arm assist when rising from sit to stand" after noting right shoulder pain.  Pet. Ex. 23 at 7; Tr. 98.  Dr. Kazmar testified that it is not uncommon for people who use their arms for weight-bearing to develop arthritis in the shoulders, elbows and wrists.  He assumed that the right shoulder pain was "becoming worse or exacerbated by her using it as a weight bearing joint."  Dr. Kazmar added that he had no independent recollection of whether petitioner used the cane to bear weight, but it would be fair to say that he attributed her shoulder pain to the weight-bearing use of the cane.  He added that he was unaware of her receiving any vaccine at that time.  Tr. 99, 119-20.

Dr. Kazmar was asked to explain the notes of his examination of petitioner's shoulder on March 6, 2014.  He stated that "PE shoulder S0, L1, 0 to 90" meant there was no swelling and she was able to abduct or raise her arm up to 90 degrees.  Pet. Ex. 23 at 7; Tr. 98-99.  Dr. Kazmar stated that his examination was normal, that there were other motions of rotation that he did not test, but her abduction was normal.  Tr. 129.

Dr. Kazmar was then asked to explain why the abbreviations page contained more information than the original record.  It stated: "Sh shoulder S0 – No swelling; T0 no tenderness; L1- reduced range of motion [with an arrow to] ROM of shoulders 0-80 degrees abduction [right] and 0-70 degrees abduction [left] PF = painful."  According to the transcription, petitioner's range of motion in her left shoulder was more reduced than in her right shoulder.  However, the original record showed only the right arm being examined, and the examination was normal.  *See* Pet. Ex. 23 at 1.  In attempting to reconcile the two records, Dr. Kazmar stated:

> Yeah.  I'm just looking at the original to see what it looks like, to make sure I didn't - - this is March.  (Document review.)  Yeah, I guess - - well, I put the L1.

---

[18]     Dr. Kazmar confused his December 2016 phone conversation with the one he documented in his records on November 4, 2013. *See infra* at 19.

> It could be it was - - yeah, I agree, we have two different things.  We have, one, a normal range of motion, and L1 would have indicated that she would have had reduced range of motion.  So, again, you know, when you're writing these notes, you know, it could have been miswritten, the 0 to 90.

Tr. 130.

Dr. Kazmar had no explanation for where the information for the left shoulder examination came from.  His explanation for the addition of "PF" ("painful") to the transcription, also not contained in the original record was "Again, it could have been just left out, I mean I didn't put it in, that she was having pain, because, you know, you would examine a patient, you sit down, and then you're thinking about something else at the same time."  Tr. 131.  However, Dr. Kazmar again confirmed that he had no independent recollection of these office visits, adding "there's a discrepancy there, and I can't explain it."  Tr. 131.

Dr. Kazmar testified that he referred petitioner for an MRI on that date, which meant that she had ongoing pain for a while because it is an expensive test and requires precertification from the insurance company, though he admitted not knowing if he ever asked her when the shoulder pain started.  He admitted that there was no reference to an MRI in the record.  Dr. Kazmar ultimately conceded that if he and petitioner had not had a conversation in December 2016, he would have no independent recollection of any of the facts.  Tr. 101, 120-21.

A script for an MRI dated March 6, 2014, was filed with the court as a separate exhibit on December 5, 2016.  *See* Pet. Ex. 19.  This script is not mentioned in his office note for March 6, 2014, and was not contained in any of the four sets of records filed from Dr. Kazmar's office in this matter.  *See* Pet. Exs. 3, 10, 23.  The record contain only a script for an x-ray which was done on March 29, 2014.  Pet. Ex. 3 at 53-54.  Dr. Kazmar explained that you write out scripts at the end of an office visit, the patient is out the door, and not everything gets into the chart.  Tr. 133.

Dr. Kazmar was then asked if he normally ordered MRIs when a patient had a normal physical examination.  He stated "of course not," but she was complaining of shoulder pain, "she had reasons to have shoulder pain because she was lifting herself up" and there is that discrepancy in the record of "L1" so she must have had pain for a while.  Tr. 133-34.  In his affidavit, Dr. Kazmar stated, "…in early March 2014, Ms. Thomas's arm and shoulder pain had not improved and she was still having a lot of pain.  I referred her for an MRI of her shoulder at that point because she had been experiencing the arm and shoulder pain for several months without any improvement."  Pet. Ex. 21 at 2.

At hearing, Dr. Kazmar was asked whether he ever followed-up with petitioner about the physical therapy that he stated he ordered on November 3, 2013, and why there was no mention of it in the March 2014 note.  He responded that he had no memory of the March 2014 examination, but it could be that he asked her about it and just did not write down the answer.  It was just one of the several problems she had that day, and he was writing less and less at that point.  Tr. 119.

Dr. Kazmar was questioned about his June 16, 2014 record. *See* Pet. Ex. 23 at 8. When asked if he recalled what was happening with petitioner's shoulder at that visit, Dr. Kazmar stated that he could only go by what was in the notes, which indicate that petitioner had redness of her eye, some issue with her carotid artery, and right shoulder pain. She was offered an injection for her shoulder but she declined. Her x-rays were reviewed. He told her to avoid overuse of the shoulder for overhead reaching or extreme motion if it were hurting, which would be a typical direction to a patient complaining of shoulder pain. Tr. 102-03.

Dr. Kazmar was asked to address his final record for petitioner on August 18, 2014. He stated that he reviewed what was happening with her to tie up loose ends, noting which doctors were treating her for her conditions. Tr. 104-05. He explained to her that shoulder pain was likely "impingement" because when arthritis develops in an upper joint, it will impinge on the tendon and hurt when you move. Tr. 105. He was asked about his examination of her shoulder on that date; he had noted that she had a limited range of motion at 0 to 60 with a painful forearm. It was noted to Dr. Kazmar that it appeared petitioner had a much more significant problem in August 2014 than she did in March 2014. Dr. Kazmar responded that it is common for people using a cane to develop a torn rotator cuff and torn labrum. The reason is twofold, genetics and weight-bearing, which make it worse. He stated that petitioner was overweight, and heavy people develop arthritis. Tr. 134. He added that 30 to 40 percent of people who are weight-bearing using an assistive device will eventually have arthritis, which petitioner had in her hips, knees, neck, and lumbar spine; therefore, it would not be surprising that she would end up with it in her shoulders as well. Tr. 135.

Dr. Kazmar stated in his affidavit that petitioner contacted his former office in December 2016 and explained that she had upper arm and shoulder pain that began shortly after she received a flu vaccine in 2013. She claimed to have spoken to him about it shortly after the pain started, but that her records did not make any mention of it until March 2014. She asked if he would review his notes and call her to discuss her situation. Pet. Ex. 21 at 1-2.

At hearing, Dr. Kazmar explained that his files were left in his old office for the new rheumatologist who took over his practice. If a patient needed to get in touch with him, they could call there and the office would reach him and provide him with a pink slip with the message attached to the file. Tr. 107-08; 126. Dr. Kazmar testified that he could not recall the conversation he had with petitioner. However, upon further questioning, he recalled petitioner telling him about the vaccine, the Vaccine Program, and her petition for compensation. Tr. 109-10. According to Dr. Kazmar, he told her that he would have to go over her records because he did not remember anything about a vaccine injury. Dr. Kazmar stated that he then met petitioner at the library, they went over the details and she told him "what she felt was the issue with the vaccine and that the pain started after she had the injection." Tr. 110. Dr. Kazmar added, "Whether it started immediately with the injection or days later, I'm really not sure. I don't think I got into all of the details on how the two, the shot and the shoulder pain, were related." Tr. 111. Dr. Kazmar agreed that the conversation in December 2016 was the first time petitioner stated to him that the shoulder pain was related to the flu vaccine. Dr. Kazmar "signed the affidavit, and then–and I went through the notes, and I just explained to her that I have no records of the vaccine." *Id.* They spoke for about twenty minutes. After that, petitioner's attorney contacted him. *Id.*

### 3. Affidavit and Testimony of Rita Thomas

On December 5, 2016, petitioner filed the affidavit of her sister, Rita Thomas. *See generally* Pet. Ex. 20. According to Ms. Thomas, she did not review any documents in order to prepare for her testimony, and did not speak to petitioner about her testimony or the substance of her testimony. Tr. 148.

Petitioner and Ms. Rita Thomas have lived together for the past 15 years. Pet. Ex. 20 at 1; Tr. 137. According to Ms. Thomas, petitioner has had several surgeries, including her back, knees, and hip. She and her sister help each other with their health issues. Tr. 138-39. According to Ms. Thomas, she and petitioner received flu vaccines on September 13, 2013, at Walgreens. Tr. 140. The store was very busy and they each received their flu vaccine from a different person. Pet. Ex. 20 at 1.

According to Ms. Thomas, petitioner first mentioned that her shoulder started hurting "a couple weeks" after the injection. Tr. 139. Petitioner asked Ms. Thomas if her arm still hurt because petitioner's was still hurting from where she had received the injection. Ms. Thomas told her sister that she felt fine. Pet. Ex. 20 at 1; Tr. 140. Ms. Thomas then added that petitioner actually said her arm hurt from the time of the vaccination. Tr. 141.

Ms. Thomas stated that at this time, petitioner was having worsening back problems for which she had previously had spinal surgery and was using a cane due to balance problems. Pet. Ex. 20 at 2; Tr. 141-42. Ms. Thomas would generally accompany her sister to doctor's appointments and went to an appointment with Dr. Kazmar in October 2013. Though she did not go in to the examination, she recalled petitioner telling her that she told Dr. Kazmar about her pain from the flu shot and that Dr. Kazmar advised that he would monitor her. Tr. 142-43.

Ms. Thomas could not recall to what visits to Dr. Kazmar she accompanied petitioner, but stated that petitioner saw him every three months. Ms. Thomas stated that she accompanied petitioner to her appointment with Dr. Oladeinde sometime in 2014 as well. Tr. 149. Ms. Thomas denied reviewing her calendar in preparation for her testimony but remembered the October 2013 visit with Dr. Kazmar because they both had flu vaccinations at the same time and petitioner was complaining about shoulder pain. Tr. 150, 154.

According to Ms. Thomas, she did not recall petitioner having pharyngitis, hoarseness, or any lab work at the October 2013 visit; she only recalled petitioner's right shoulder pain because that was the pressing issue for her at the time and that was the reason she went to see Dr. Kazmar on that date. Tr. 150-51.

When Ms. Thomas was told that petitioner had testified that, due to the significant problems with her lower back and left hip in the fall of 2013, she did not pay much attention to her right shoulder pain, Ms. Thomas agreed that would be correct. But she then added that Dr. Kazmar was an arthritis doctor and petitioner saw him for her back and hip, and when the shoulder pain started, she discussed it with him as well. Tr. 152.

Ms. Thomas stated that petitioner had trouble raising her arm and reaching into cabinets, and was in constant pain since October 2013.  Tr. 143-44.  She believes petitioner communicated this to Dr. Kazmar again three months later and he ordered an x-ray or some other test for her arm, but she did not have it done because she did not have the money for the co-pay and was dealing with her back and spine problems at the time.  Pet. Ex. 20 at 2.

According to Ms. Thomas, petitioner had continued pain from 2013 into 2014 when she decided to have surgery.  The pain got worse; she complained more and more and she was able to do less.  Tr. 144-45.  Ms. Thomas assisted her with all of her overhead activities and grooming of her hair from 2013 until her surgery.  Tr. 153, 155.  Ms. Thomas was with petitioner for the surgery and took care of her afterwards.  Tr. 145.  According to Ms. Thomas, petitioner had surgeries in the past, but this was the most painful and there were a lot of things she could not do.  Tr. 146.  Ms. Thomas submits that over the past three years, she has experienced petitioner's complaints about her shoulder and even seen her cry over the pain and discomfort she has experienced.  Pet. Ex. 20 at 2.

According to Ms. Thomas, petitioner has used a cane for balance for about 10 years; she does not put much pressure on it and she does not use it to go from sitting to standing.  Tr. 147.  When asked how petitioner would get up from a seated to standing position, Ms. Thomas stated that she stands up on her own.  Tr. 154.  When I pointed out that I had asked petitioner to stand up, and she put her hands on the table to stand up, Ms. Thomas conceded that, if there is a chair or table nearby, she will use it to stand.  Tr. 154.

## II. Legal Framework

Petitioners bear the burden of establishing their claims by a preponderance of the evidence.  § 13(a)(1).  A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition.  § 11(c)(2).  Medical records created contemporaneously with the events they describe are presumed to be accurate and "complete" such that they present all relevant information on a patient's health problems. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  In making contemporaneous reports, "accuracy has an extra premium" given that the "proper treatment hang[s] in the balance."  *Id.*  A patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable.  *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993); *see Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)).  Contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence."  *Cucuras*, 993 F.2d at 1528.  Indeed, "where later

testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Id.*

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical records . . . but does not require the special master or court to be bound by them"). In short, "the record as a whole" must be considered. § 13(a).

### III. Discussion and Findings of Fact

### A.      Petitioner's First Documented Complaint Attributing Her Shoulder Pain to the Vaccine Was in May 2015

It is indisputable on the face of the records that no medical professional related petitioner's complaints of right shoulder pain to her flu vaccination. There is also no record by any medical professional that petitioner mentioned having received a flu vaccination in her right shoulder until May 21, 2015, when petitioner presented for EMG testing and reported having pain in her shoulder after a flu shot "one year ago." Pet. Ex. 1 at 8. Petitioner stated that the

record was incorrect.  Tr. 79.  Thereafter, she reported onset of pain in her shoulder to Dr. Chandler, filling out a form with a date of onset as September 20, 2013.  Pet. Ex. 27 at 101.  This was only after she learned of shoulder injuries associated with vaccines and the Vaccine Program from a news show in late 2014 or early 2015.  Tr. 42-43.

There is no credible evidence to support a finding that petitioner experienced any unusual or unexpected pain in her right shoulder upon receipt of, or immediately after her vaccinations.  The first time petitioner reported pain in her shoulder associated with the receipt of a flu vaccination to any medical provider was in May of 2015, after she learned about the Vaccine Program and shoulder injuries associated with the receipt of influenza vaccines from a news report.

**B.    Petitioner Has Not Put Forward Evidence Sufficient to Refute the Contemporaneous Medical Records, Which Support the Onset of Her Shoulder Pain in January 2014**

**1.    Petitioner's Testimony, Affidavit, and Medical Records Are Inconsistent with One Another**

In her affidavit, petitioner stated that she did not report her shoulder injury to any of her treating physicians for months after her vaccination because she was more concerned at the time with "some new and unusual back pain . . . affecting my mobility and balance." Pet. Ex. 11 at 1-2.  She was also taking care of her brother who was ill.  Petitioner further affirmed in the months that followed, her right shoulder and arm were painful and weak, but she thought the pain and weakness would go away.  Petitioner affirmed that when she saw Dr. Oladeinde for the first time in January 2014, she gave her a full medical history, including shoulder pain.  She also complained to Dr. Kazmar in March 2014 and he "referred me for an X-ray of my shoulder, which I had done later that month." *Id.* at 2.  Petitioner stated that she did not complain of her shoulder pain again until September 2014, when she returned to Dr. Oladeinde, but Dr. Oladeinde did not pay attention to her complaints.  *Id.*

However, at hearing, petitioner testified that she told the nurse in Dr. Robinson's office on October 3, 2013, that she had pain in her shoulder when she would lie in a certain way.  Tr. 69-70.  She further testified that she "casually" mentioned pain in her right shoulder after a flu injection to Dr. Kazmar on October 24, 2013.  Tr. 15.  She testified that she called Dr. Kazmar on November 4, 2013, to advise him about her shoulder problem getting worse.  Tr. 18.  She detailed a discussion with Dr. Kazmar on November 4, 2013, about going for physical therapy for six weeks with a follow-up thereafter.  Tr. 55-57.  She testified to a script for physical therapy being left for her to pick up the next day, but that she never picked it up, because she had other things going on in her life and could not afford the physical therapy.  Tr. 17-18, 54-55, 58.  There is nothing in the medical record to support these facts.

Petitioner's affidavit does not mention seeing Dr. Finn in November 2013, but at hearing she testified that she told both, Dr. Finn and his assistance about her shoulder pain, but they did not pay attention to her because she was there to discuss her knee and the possibility of additional surgery.  Tr. 70-71.  There is no record of this conversation.

Petitioner's testimony about her visit with Dr. Oladeinde is not consistent with Dr. Oladeinde's medical record. Petitioner testified that she spoke at length to Dr. Oladeinde in January 2014 about her shoulder pain from the flu vaccine, but Dr. Oladeinde said she had never heard of a flu vaccine causing shoulder pain. Tr. 20-21, 23. Petitioner stated that Dr. Oladeinde suggested she see a specialist for her shoulder, but petitioner did not go. Tr. 22-23. It is notable that Dr. Oladeinde performed and documented a comprehensive examination of petitioner on that date with no reference to any shoulder pain, limitation of movement on examination or conversation about any shoulder injury or vaccination. Pet. Ex. 2 at 31-32. Dr. Oladeinde referred petitioner to multiple specialists, none of which was for her shoulder.

Petitioner's testimony about her inability to afford the physical therapy and MRI she stated was ordered by Dr. Kazmar, was unconvincing. Tr. 24, 28, 63; Pet. Ex. 11 at 2. She had Medicare coverage and was seeing a host of specialist for a variety of treatment during this time frame. She further requested and was provided with numerous referrals by Dr. Oladeinde in January 2014 and by Dr. Kaistha in April of 2014, along with being sent for and undergoing various testing procedures. Pet. Ex. 34 at 11-19; Pet. Ex. 3 at 17, 23, and 47. The medical record contains no references to physical therapy or an MRI being ordered.

Petitioner's testimony about the severity of her shoulder pain, varied. Petitioner testified that by March 2014, her shoulder pain had gotten worse and she could not comb her hair or raise her arm overhead. Tr. 24-25, 72. When asked to whom she complained about her shoulder pain between September 13, 2013, and March 6, 2014, she responded that she mentioned it to Dr. Kazmar, but the pain was not significant because she was taking medications that covered it up, and she had other issues going on at that time. She then stated that she was trying to ignore the pain because she did not want to accept that she was having another skeletal issue. Tr. 71-72. Both Dr. Oladeinde's examination in January 2014 and Dr. Kazmar's examination in March 2014 of petitioner's right shoulder were normal, which is inconsistent with petitioner's testimony of limitation of motion and significant pain.

Petitioner did not testify accurately about the use of her cane. Petitioner admitted to using a cane for balance for years, but denied that she was bearing weight on it. She denied using her cane to stand from a seated position. Tr. 26-27. When asked to stand at hearing, petitioner needed to lean on the table in order to stand up from a seated position. Tr. 154. Her balance and mobility issues were well documented since 2002 as a result of lower back pain, hip, and knee issues. *See* Pet. Ex. 9 at 7; Pet. Ex. 23 at 4, 6; Pet. Ex. 26 at 7, 10, 33; Pet. Ex. 32 at 13. As of 2009, petitioner was deemed to be disabled due to spinal fusion and ataxia. Pet. Ex. 28 at 13. The records taken as a whole support that petitioner is clearly bearing weight on her cane, which she uses with her right hand.

When questioned about the content of her medical records from 2014 through 2015, petitioner consistently stated that her medical records were inaccurate. Petitioner testified that the record at Ingalls Calumet City Primary on June 4, 2014, which reported normal strength and range of motion of the upper extremities, was wrong. Pet. Ex. 3 at 11-15; *cf.* Tr. 73, 80-81. The October 2014 record of Dr. Oladeinde documenting receipt of a flu vaccine in her right arm was wrong. Pet. Ex. 2 at 25-27; *cf.* Tr. 33-34, 75. Dr. Oladeinde's December 5, 2014 record

24

documenting a Zostavax vaccine administered in her right arm was wrong. Pet. Ex. 2 at 21; *cf.* Tr. 75-76. The history upon presentation for the EMG on May 21, 2015, of "flu shot last year" with development of shoulder pain was wrong. Pet. Ex. 1 at 8; *cf.* Tr. 79. The Walgreens record of vaccination on September 13, 2013, indicating receipt of both flu and Zostavax vaccines was wrong. Pet. Ex. 8 at 3; *cf.* Tr. 65. It seems unlikely that so many medical providers could make so many mistakes.

Petitioner's medical records confirm that the health issues she described as "new and unusual" and distracting her from her right shoulder and arm pain following the September 13, 2013 flu vaccination, were the same health issues petitioner had been dealing with for years. Furthermore, in the six-month period following petitioner's receipt of the subject flu vaccine, she presented to physicians on six occasions—including the day of her vaccination—with no complaints of shoulder pain following or as a result of the flu vaccination.[19] Neither Dr. Oladeinde in January 2014, nor Dr. Kazmar in March 2014, documented any complaint of shoulder pain associated with a flu vaccine received in September 2013. Pet. Ex. 3 at 80-85, 92; Pet. Ex. 32 at 4-6; Tr. 67-68.

Petitioner testified that her shoulder pain worsened "a little bit" after her flu vaccination, but the hydrocodone masked her pain so it "was not significant." Tr. 14, 71-72. She then stated she was trying to ignore the pain. Tr. 72. Petitioner has been taking hydrocodone ("Norco") for years, and it clearly was not masking all of her other pain for which she was under the care of multiple specialists. Nor did it mask her shoulder pain as it evolved after March 2014. Petitioner's testimony was insufficient to carry her burden in the face of contrary medical record evidence

### 2. Dr. Kazmar's Testimony and Affidavit Were Inconsistent with One Another and Both Were Inconsistent with the Medical Records

As previously stated, four sets of medical records from Dr. Kazmar were produced in this matter. *See* Pet. Exs. 3, 10, 23, 28. Dr. Kazmar provided nine pages of handwritten notes, filed as Pet. Ex. 23, which purported to be a transcription of his office notes from March 2012 through August 2014, filed as Pet. Ex. 10, which he certified as being true and accurate. *See* Pet. Ex. 24. He also provided a table of abbreviations and their meanings to assist the understanding of his records. Pet. Ex. 23 at 1-2. Dr. Kazmar testified to transcribing his office records by hand "exactly the way the original records were, only in a more legible manner," Tr. 87-88. However, as his testimony revealed, his transcription went far beyond his actual records. Pet. Ex. 10; *cf.* Pet. Ex. 23.

Dr. Kazmar prefaced his testimony at hearing by stating that he had no independent recollection of any office visits with petitioner in 2013 and 2014, making his elaborate and detailed testimony during hearing and contained in his affidavit, not credible. Tr. 107.

Dr. Kazmar saw petitioner on October 24, 2013, a little over a month after petitioner received the flu vaccine. The record does not mention right shoulder pain, any examination of

---

[19]     Based on the records that were filed, it appears that there may have been other medical providers for which medical records were not filed for this time frame.

the right shoulder, or a flu vaccine having been received on September 13, 2013.  Dr. Kazmar testified that petitioner had so many problems, he may not have documented her shoulder complaint on that day, but later admitted that he really did not know if she mentioned her shoulder that day.  Tr. 92-93, 117, 123.  He also admitted that he did not know anything about a flu vaccination until December of 2016 when petitioner told him about it.  Tr. 111, 119-20.

Dr. Kazmar's medical record for March 6, 2014, is the first time Dr. Kazmar documented right shoulder pain.  In his affidavit, he described in detail seeing petitioner on that date with complaints of a lot of pain in her arm and shoulder.  He affirmed that he ordered an MRI because she had been experiencing arm and shoulder pain for several months without improvement.  Pet. Ex. 21 at 2.

However, at the hearing, Dr. Kazmar testified that the record for March 6, 2014, only documented right shoulder pain, cough, and left hip pain and "uses a cane to walk and uses right arm assist when rising from sit to stand."  Pet. Ex. 23 at 7; Tr. 98.  Dr. Kazmar admitted that he attributed her shoulder pain to her bearing weight on a cane.  Dr. Kazmar confirmed that he was unaware of her receiving any vaccine at that time.  Tr. 99, 119-20.  Dr. Kazmar's testimony was inconsistent with the elaborate details provided for that office visit in his affidavit.

Dr. Kazmar's testimony was inconsistent with his transcription and abbreviations which were inconsistent with his original medical record.  On March 6, 2014, Dr. Kazmar documented no swelling, and abduction to 90 degrees for the right shoulder.  Tr. 98-99; Pet. Ex. 23 at 7.  There is no mention of any examination of the left shoulder.  Yet, the abbreviations page, contained details of a left shoulder examination as well as a reduced range of motion of the right shoulder.  Dr. Kazmar was unable to reconcile the records, stating:

> Yeah, I guess—well, I put the L1.  It could be it was—yeah, I agree, we have two different things.  We have, one, a normal range of motion and L1 would have indicated that she would have had reduced range of motion.  So, again, you know, when you're writing these notes, you know, it could have been miswritten, the 0 to 90.

Tr. 130.  Dr. Kazmar also had no explanation for how his transcription contained "PF" referencing "painful" when it was not contained in the original record.  Dr. Kazmar testified, "Again, it could have been just left out.  I mean I didn't put it in, that she was having pain, because, you know, you would examine a patient, you sit down, and then you're thinking about something else at the same time."  Tr. 131.  Dr. Kazmar then conceded, "No, I mean, there's a discrepancy there, and I can't explain it."  Tr. 131.

By the time Dr. Kazmar was asked to address his record for June 16, 2014, he conceded that he could only go by what was contained in the office notes.  He stated that the record reflected that petitioner was offered an injection for the shoulder pain but she declined.  Her x-rays were reviewed.  He told her to avoid overuse of the shoulder for overhead reaching or extreme motion if it was hurting, which would be a typical direction to a patient complaining of shoulder pain.  Pet. Ex. 23 at 8; Tr. 102-03.

Dr. Kazmar's final visit with the petitioner on August 18, 2014, was discussed. He agreed that her examination showed a range of motion of the right shoulder at 0 to 60 which was worse than her normal examination in March 2014. Tr. 134. Dr. Kazmar testified that it is common for people using a cane to develop a torn rotator cuff and torn labrum and the reason is twofold, genetics and weight bearing, which makes it worse. Additionally, petitioner was overweight, and heavy people develop arthritis. He added that 30 to 40 percent of people who are weight bearing using an assistive device will eventually have arthritis, which petitioner has in her hips, knees, neck, and lumbar spine. Therefore, it would not be surprising that she would end up with it in her shoulders as well. Tr. 135. He admitted that, at the time, he believed that petitioner's progression of right shoulder pain was the result bearing weight on her cane, due to instability and balance issues, resulting from ongoing back, hip, and knee problems. He knew nothing about any vaccination or its relationship to any shoulder pain until December 2016, when petitioner called him. Tr. 43-45, 121.

Dr. Kazmar was unable to reconcile the inconsistencies between his testimony, affidavit, and various versions of his medical records. His original medical record written contemporaneously with his examinations of the petitioner was more persuasive and credible.

### 3.     The Testimony Associated with Dr. Kazmar's Office Note of November 4, 2013 was Inconsistent with the Record Evidence.

Petitioner's affidavit stated that she did not complain about her shoulder pain to anyone until she saw Dr. Oladeinde in January 2014. At hearing, petitioner testified that she mentioned her shoulder pain from her flu vaccine to Dr. Kazmar at her October visit, and then called him on November 4, 2013, to advise him that her shoulder pain was worse. Tr. 15-18; Pet. Ex. 11 at 2. Petitioner testified in detail to her discussion with Dr. Kazmar and his ordering physical therapy for six weeks with follow-up after the therapy. Tr. 55-57. Petitioner testified that Dr. Kazmar left a prescription for physical therapy for her to pick up the next day, but she never picked it up. Tr. 17-18, 54-55, 58.

Dr. Kazmar, admitted that his October 2013 office record made no mention of any complaints of shoulder pain. He then testified that his note of November 4, 2013, was about petitioner's shoulder. Pet. Ex. 23 at 7. Dr. Kazmar stated that in the note of November 4, 2013, "PT" meant "physical therapy" and "TPU" meant she was "to pick up" the script in the morning. Tr. 94-95, 115-17. Dr. Kazmar was unable to find a copy of the script for physical therapy. Tr. 118. When asked why the words "physical therapy" written on the transcription but not contained in his original office note, he testified that he added "physical therapy" to make it clear what his thoughts were. Tr. 126-28. In an attempt to reconcile his testimony with his original record, Dr. Kazmar stated that it was possible that petitioner called for her lab results on November 4, 2013, and in the course of that conversation mentioned something hurting. It could have been the shoulder. Tr. 94-96.

Review of Dr. Kazmar's records over the years reflect routine conversations following office visits with petitioner about her test results, with the results usually mailed to her after the conversation. *See generally* Pet. Ex. 28. It is more likely, as Dr. Kazmar was asked but denied, that he and petitioner discussed her blood work results in that phone call and she was to pick up

("TPU") a copy of it to take to a new primary care physician she was going to see for her next routine visit due to Dr. Kazmar's impending retirement. Tr. 126-27.

Dr. Kazmar stated that he transcribed his records "exactly the way the original records were, only in a more legible manner," however, the transcription had more details than the original record with no explanation as to why that was. Tr. 87-88; *See* Pet. Ex. 10; *cf.* Pet. Ex. 23. Dr. Kazmar embellished the facts at the behest of the petitioner, based on what she told him during their conversation in December of 2016 and January of 2017. Petitioner and Dr. Kazmar's testimony regarding the November 4, 2013 office visit is inconsistent with the contemporaneous medical record for that date.

### 4.    The MRI Prescription of March 6, 2016 is Inexplicable

The MRI prescription filed as a separate document on December 5, 2016, but not found in any of the four sets of records from Dr. Kazmar's office filed in this matter is confounding. Pet. Exs. 3, 10, 23, 28. The only prescription contained in any of the records from Dr. Kazmar's office for this time frame was for the x-ray, which was performed on March 29, 2014. Pet. Ex. 3 at 53. Dr. Kazmar's explanation that prescriptions are given to patients on their way out and copies sometimes do not make it into the file was unconvincing, since the copy of the prescription for the x-ray presumably given at the same time made it into the file. Tr. 133. No explanation for where the MRI prescription came from in December 2016 was provided.

In her affidavit, petitioner referred to being sent only for an x-ray after her March 6, 2014 visit. Pet. Ex. 11 at 2. At the time of hearing, she testified to being sent for both, x-rays and an MRI, but did not have the MRI because she could not afford it. Tr. 28. With the amount of treatment being received by petitioner from the various specialties at that time and the existence of her medical insurance coverage, petitioner's explanation for why she would not have gone is simply not believable.

Dr. Kazmar's rationale for claiming to have sent petitioner for an MRI when there was no medical reason for ordering one, is flawed. Tr. 101, 120.

### 5.    The Facts Testified to by Both Petitioner and Dr. Kazmar Appear to Have Come from Their Conversations and Meetings in December 2016 and January 2017 and Are Inconsistent with the Contemporaneous Medical Records Filed in this Matter.

According to petitioner, she spoke with Dr. Kazmar in December 2016 for the first time since August 2014. She "reminded" him of her shoulder injury that she casually mentioned in October 2013. She told him she had an attorney for a vaccine claim, she told him what she was going through, and that she might need him as a witness, and asked him to help with the information she needed. Tr. 43-45. The two had several follow-up conversations and after a substantive conversation, they met in the library in January 2017 for Dr. Kazmar to sign an affidavit, which notably was notarized by the petitioner.[20] Tr. 45-48; Pet. Ex. 21 at 3.

---

[20]    Petitioner worked in a law office during her career.

Dr. Kazmar initially testified that he did not recall the conversations he had with petitioner in December 2016, but then recalled petitioner telling him about a vaccination, the Vaccine Program, and her petition for compensation.  Though Dr. Kazmar stated he knew nothing about a flu vaccination, he met petitioner at a library, where they went over the details and she told him "what she felt was the issue with the vaccine and that the pain started after she had the injection."  Tr. 109-10.  Dr. Kazmar added, "Whether it started immediately with the injection or days later, I'm really not sure.  I don't think I got into all of the details on how the two, the shot and the shoulder pain, were related."  Tr. 111.  Dr. Kazmar testified that the conversation in December 2016 was the first time petitioner stated that the shoulder pain was related to the flu vaccination.  *Id.*  Dr. Kazmar then "signed the affidavit, and then - - I went through the notes, and I just explained to her that I have no records of the vaccine."  *Id.*  They spoke for about 20 minutes or so and then petitioner's attorney contacted him.  *Id.*

Because of his history with petitioner, Dr. Kazmar may have been willing to add details to the record that had not been previously recorded, but it was clear that these details came from his conversations with petitioner in December 2016 and January 2017 and after petitioner learned about the Program and shoulder injuries from vaccinations from a news report.  The contemporaneous medical records were more consistent, cogent and compelling in this matter than the testimony.

### 6.  Rita Thomas's Testimony Was Inconsistent with Petitioner's Testimony

Ms. Rita Thomas provided no help since her testimony conflicted with the testimony of both petitioner and Dr. Kazmar as well as the medical records.  According to Ms. Rita Thomas, petitioner presented to Dr. Kazmar in October 2013 for right shoulder pain because that was the pressing issue for her at the time and that was the reason she went to see Dr. Kazmar on that date.  Tr. 150-51.  She recalled petitioner telling her that she told Dr. Kazmar about her pain from the flu shot and that Dr. Kazmar advised that he would monitor her.  Tr. 142-43; Pet. Ex. 20 at 2.

Ms. Thomas then stated that petitioner had significant problems with her lower back and left hip in the fall of 2013, and did not pay much attention to her right shoulder pain but added that Dr. Kazmar was an arthritic doctor and petitioner saw him for her back and hip.  Therefore, when the shoulder pain started, she discussed it with him as well.  Tr. 152.

Ms. Thomas's testimony was inconsistent with that of petitioner and Dr. Kazmar, and provided no assistance with the facts in this matter.

### 7.  There Is No Proof that Petitioner Received the Flu Vaccine in Her Right Arm

Finally, the fact remains that petitioner has no proof to which arm the influenza vaccine was administered.  She disputes receiving two vaccines that day, contrary to the pharmacy record.  She also disputes the accuracy of the record that documents her receipt of a flu vaccine in 2014 and a Zostavax vaccine in 2015, both in her right arm.  Petitioner lacked any credibility in this matter and therefore, there is no proof of which arm the flu vaccine was administered in.

### IV. Conclusion

Upon careful review of the record, I find that petitioner's symptoms of right shoulder pain began around January 10, 2014 when she presented to Dr. Oladeinde, but became more pronounced when she presented to Dr. Kazmar on March 6, 2014. At this stage in the case, there has not yet been an expert medical opinion provided on causation of petitioner's right shoulder pain. Accordingly, the following is ORDERED:

**By <u>Monday, July 30, 2018</u>, petitioner shall file either an expert report that is based on the facts as found herein, or a status report indicating how she intends to proceed.** Petitioner shall provide a copy of this Onset Ruling to each of her expert witnesses, and her expert(s) shall rely on the timing of onset as I have found it in this Ruling. If petitioner is unable to secure reports from her expert(s) based on the timing of onset as I have found it, she shall file either a motion to dismiss, a joint stipulation for dismissal, or a motion for a ruling on the record, all of which will result in the dismissal of her claim.

**IT IS SO ORDERED.**

<u>s/Mindy Michaels Roth</u>
Mindy Michaels Roth
Special Master